## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| PAUL GARCIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **No. 04-2307-CM** |
| | ) | |
| SPRINT/UNITED MANAGEMENT CO., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM AND ORDER

On July 2, 2004, plaintiff Paul Garcia brought this cause of action against defendant Sprint/United

Management Company.  Plaintiff claims that defendant discriminated against him in the terms and conditions

of his employment because of his race/national origin, in violation of the Kansas Act Against Discrimination

("KAAD"), Kan. Stat. Ann. § 44-1001 *et seq*., Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e *et seq*., and 42 U.S.C. § 1981.  This matter comes before the court on defendant's Motion

for Summary Judgment (Doc. 57).

I.      **Facts[1]**

A.      **Plaintiff's Employment**

Plaintiff, a Hispanic, worked for defendant from August 11, 1986 to January 1992 and again from

October 13, 2000 to October 14, 2002.  Dena Swackhammer, a Caucasian female, hired plaintiff in

October 2000 as the senior director of database marketing and customer relationship management.  Plaintiff

---

[1]The court construes the facts in the light most favorable to plaintiff as the nonmoving party pursuant
to Fed. R. Civ. P. 56.

remained a senior director until defendant terminated his employment in October 2002.  During his employment from October 2000 to October 2002, except for his last month of employment, plaintiff reported directly to Swackhammer.  Plaintiff had no complaints about how Swackhammer treated him personally.  During the last month plaintiff worked for defendant, plaintiff reported to Pragnesh Shah, an Asian/Pacific Islander male.  Plaintiff never heard Shah say anything to him that he interpreted as racist.  Plaintiff did not have any complaints about Shah prior to his termination, except that Shah did not seem interested in the work plaintiff and his group were doing.

During the time period at issue, Swackhammer reported to Antonio Castanon, a Hispanic male and a senior vice president who reported directly to Chuck Levine, a Caucasian male and president of Sprint PCS, until Levine's departure from defendant on September 30, 2002.  With the exception of the termination decision, plaintiff had no complaints about how Castanon treated him during his employment with defendant.  Plaintiff had little contact with Castanon.  Plaintiff heard Castanon joke one time in a staff meeting about how Spaniards speak, but plaintiff could not remember when the comment was made or any specifics about the comment.  Plaintiff is not aware of anything Castanon did to him or to other employees that plaintiff considered to be racist.  Likewise, Castanon never said anything to Swackhammer about plaintiff that she interpreted as derogatory towards plaintiff's race.

In 2001, plaintiff received a "2" rating on his performance evaluation, which meant he exceeded the expectations for his position. Swackhammer and Castanon both signed this performance evaluation. Castanon wrote on the evaluation, "Paul, Terrific year!  Thanks for your contribution and leadership.  Tony."

Jim Kissinger, a Caucasian male, is currently the senior vice president of human resources.  Between 2001 and April 2003, he was the vice president of human resources for Sprint PCS.  In his capacity as vice

president, Kissinger was present when Castanon made the decision to terminate plaintiff and

Swackhammer's employment.  Kissinger concurred with Castanon's decision.  Plaintiff had very limited

contact with Kissinger.  Kissinger never did anything to plaintiff that plaintiff considered to be racist.

### B.    Swackhammer's Employment

On December 8, 1997, defendant hired Swackhammer as vice president of loyalty.  Her assignment

was to reduce PCS (cell phone) turnover, and her supervisor was Levine.  In 1999, Swackhammer became

responsible for supervising the newly created database marketing function, and her title changed to vice

president of customer management.  In October 2000, when Levine was promoted to president, Scott Relf,

senior vice president of marketing, became Swackhammer's supervisor.  Her duties and job title remained

unchanged.  In May 2001, plaintiff began reporting to Castanon.  In spring 2002, the individuals who

directly reported to Castanon included Swackhammer and four other vice presidents, including two other

women and two men (Faerie Kizzire, Laurie Kistler, Todd Waletzski, and Alan Winters[2]).

Swackhammer's duties remained unchanged, but her title was changed to vice president of customer

solutions.  In August 2001, Swackhammer became responsible for supervising PCS "call centers" and other

customer care functions.  She continued to report to Castanon, but her title was changed to vice president of

strategy and activations.

During the first week of October 2002, Swackhammer was assigned to defendant's interim task

force for removing cost from the business.  Swackhammer claims that, although she remained a vice

president, her former job responsibilities were reassigned to three men.  Castanon told Swackhammer that

---

[2] Winters is a Caucasian.  The record does not reflect the races/national origins of Kizzire, Kistler
or Waletzski.

she would remain on the task force until Kissinger located a permanent position for her.  Swackhammer

remained a vice president in the interim assignment until defendant terminated her employment in October

2002.  Castanon was Swackhammer's direct supervisor at the time her employment was terminated.

Defendant contends that when Swackhammer's employment was terminated, Shah assumed her existing

responsibilities, and the rest of her responsibilities were assumed by the marketing department.

Swackhammer separately filed a gender discrimination lawsuit in this court as a result of the termination

decision.

        **C.**     **Complaints Regarding Plaintiff**

On July 18, 2002, Swackhammer received, and Castanon was copied on, an anonymous complaint

regarding plaintiff's travel schedule and plaintiff bragging about his trips and his new Mercedes.

Swackhammer discussed the complaint with plaintiff.  Plaintiff testified that, in response to the complaint,

Swackhammer questioned him about whether he had meetings or vendor trips scheduled around social

events and whether he bragged about trips he had taken.  Castanon did not direct Swackhammer to counsel

plaintiff or to change any behavior as a result of the complaint.

On August 2, 2002, defendant received an anonymous complaint on its ethics hotline alleging that

plaintiff had placed confidential information on a public server and had also received inappropriate gifts from

vendors.  Swackhammer talked with plaintiff about the complaint.  Swackhammer also discussed the

complaint with Castanon.  Plaintiff told Swackhammer that the complaint resulted from an occasion when he

backed up the hard drive of his computer to a drive he believed to be secure and that someone had

searched his entire directory.  Swackhammer told plaintiff that he should be careful about backing up

confidential information on a shared drive. On September 30, 2002, Swackhammer sent an e-mail to

corporate security with plaintiff's response to the August 2, 2002 complaint.

On August 8, 2002, through defendant's ethics office, Levine and Castanon received an

anonymous, written complaint about alleged unethical conduct in the customer solutions group, and

particularly by plaintiff. Kissinger received a copy of the August 8, 2002 complaint on August 9, 2002.

Swackhammer was not informed of the August 8, 2002 complaint and did not see a copy of the complaint

until this litigation began. On August 13, 2002, corporate security opened its case file and began its

investigation of the August 8, 2002 complaint. Kissinger called plaintiff and informed him that corporate

security was going to be contacting him about the complaint. Corporate security interviewed both plaintiff

and Swackhammer on September 30, 2002.

### D.     Complaint About Castanon and Winters

On August 16, 2002, John Meyer received an anonymous written complaint about Winters and

Castanon regarding alleged unethical behavior with outside vendors. Kizzire, who reported to Castanon,

made the August 16, 2002 complaint. Corporate security interviewed Kizzire about the complaint on

August 23, 2002; Winters on October 2, 2002; and Castanon on October 4, 2002. In her statement to

corporate security regarding the complaint, Kizzire discussed the close relationship between Castanon and

Winters.

### E.     Plaintiff's Interview with Corporate Security

Loren Procter and Paul Bass of corporate security interviewed plaintiff for several hours on

September 30, 2002. After the interview, corporate security prepared a draft of a written statement for

plaintiff's signature. Plaintiff reviewed the draft, made notations, and then gave it back to corporate security.

Corporate security revised plaintiff's statement and gave it back to him for another review.  Plaintiff believes that he went back to corporate security on September 31, 2002, to sign his statement.  Plaintiff felt pressured to sign the statement, but contends that corporate security told him not to sign anything that was false.  Plaintiff contends that corporate security threatened that if he did not sign the statement, he would be reported to his supervisors and disciplined or fired.  Plaintiff felt that corporate security was aggressive and intimidating.  However, plaintiff does not know if corporate security treated him differently than it treats any other employees.

Plaintiff believes the statement that he signed was incomplete.  Plaintiff contends that there are things he discussed with corporate security that are not in the statement, such as clarifications of different issues and answers to some questions.  Specifically, plaintiff contends that the following facts were left out: that plaintiff was a senior director, not just a director; that plaintiff was asked if he was aware of the reason he had been asked to speak with corporate security and plaintiff said no, but that he suspected it had to do with the data that had been found; that plaintiff had called IT support the night before trying to find out who had logged into his personal files; that plaintiff was trying to erase his personal files from the non-protected server once he realized it was not secure; and there was nothing about plaintiff's conversations with Kissinger. Plaintiff further contends that corporate security and Kissinger misled plaintiff in that they allegedly said that they would "assist [plaintiff] in giving his case on his behalf."  With regard to the business purposes of his trips, plaintiff contends that he was asked only specific questions about the business trips rather than the purposes of the trips.

However, plaintiff contends that he signed the statement even though he felt it was incomplete because he was being coerced and he was afraid that corporate security would misrepresent him if he did not.

-6-

F.     **Swackhammer's Interview with Corporate Security**

Swackhammer met with corporate security on September 30, 2002.  Procter and Bass conducted the interview, which lasted between two to three hours.  On October 2, 2002, corporate security prepared a draft statement summarizing the discussion Swackhammer had with them, and provided it to Swackhammer.  Swackhammer reviewed the draft statement and made modifications to it.  She waited while corporate security made the changes.  She does not recall how many drafts they went through together before they got to the final version.  Swackhammer's draft statement includes her handwritten modifications.  She reviewed and signed the final version of her statement the same day.  She admits that, by signing, she was acknowledging that the statements and facts recited in the statement were true and correct.  The statement and facts were true and correct, however, Swackhammer testified they were not complete because there was not a complete description of the discussion she had with corporate security over a period of several hours.

Swackhammer testified that there appears to be nothing in the signed statement to support her position; rather, it is just a series of answers to questions which may or may not represent her in a positive light.  Swackhammer believes that Bass and Procter drafted her statement so that it emphasized negative information, without including information and/or documents that would explain why her actions and the circumstances did not violate defendant's principles of business conduct ("PBC"), including providing a bigger picture of vendor trips that Swackhammer took.  Swackhammer also testified that she had no idea why Bass or Procter would want to represent her in something other than a positive light but that she believed Bass and Procter did not put everything in the statement because the purpose of the investigation was not to get her full, complete story of how she operated the business or conducted herself as an

employee; instead, the purpose was to gather a set of circumstantial evidence to be used as an excuse to terminate her employment.  Swackhammer testified that Bass and Procter had an "ulterior motive" for their investigation other than trying to understand how she conducted herself.   However, Swackhammer also admitted that she does not know what Bass's and Procter's ulterior motive may have been.

Having seen Bass and Procter in a couple of depositions, and having heard plaintiff's testimony about his interview with corporate security, Swackhammer now believes that this was a common practice – Bass and Procter are given a task and they "go after" employees with a vengeance.  Swackhammer does not know whether corporate security used the same questioning techniques or treated other employees any differently when they were questioned.

G.      Castanon and Kissinger's Meeting with Corporate Security

At the conclusion of the investigation into the August 8, 2002 complaint, Procter and Bass from corporate security met with Castanon and Kissinger to discuss the relevant facts that were discovered during the investigation.  The meeting took place on October 7, 2002.  Beth Forwalder, an in-house lawyer for defendant, was also present.  Castanon testified that he does not recall Forwalder saying anything during the meeting.

Castanon explained that Procter and Bass were there to answer questions about the facts of the investigation, but Procter and Bass did not participate in the actual termination decision.  Three employees (Swackhammer, plaintiff and Winters) were discussed during the meeting.  Kissinger testified that Swackhammer, plaintiff and Winters were all investigated within the same time frame, however, the primary purpose of the October 7, 2002 meeting was to resolve the concerns about Swackhammer and plaintiff.  Kissinger testified that, during the meeting, Castanon was updated on information from the investigation and

asked for a decision on how to proceed with Swackhammer and plaintiff.  Castanon testified that nobody

suggested during the meeting that he or Kissinger talk with Swackhammer or plaintiff, or obtain additional

information before a decision was made.  Castanon also testified that he was not given any information other

than what was reflected in the documents he reviewed during the meeting.

     **H.**    **Basis for Castanon's Termination Decisions**

     Castanon testified that he based his decision to fire Swackhammer and plaintiff on the documents he

received and reviewed at the October 7, 2002 meeting, and that he made the decision to terminate

Swackhammer's and plaintiff's employment during the meeting.  During the meeting, Castanon reviewed: (1)

Swackhammer's statement, (2) plaintiff's statement, (3) Winters' statement, (4) the gifts, favors, travel and

entertainment section of defendant's PBC, (5) the conflicts of interest section of defendant's PBC, (6) a

letter to defendant's officers regarding the travel and entertainment policy, (7) an April 4, 2002 e-mail from

plaintiff to Swackhammer, (8) a May 29, 2002 e-mail from plaintiff to Greg Spero, (9) a June 25, 2002 e-

mail from plaintiff to Swackhammer, (10) a July 23, 2002 e-mail from plaintiff to Swackhammer, and (11)

photographs of Swackhammer and plaintiff on the Concorde drinking champagne and eating caviar.

Castanon testified that, after reviewing the documentation, he believed the "appearance of impropriety" with

Swackhammer and plaintiff was clear.

     **1.**    **April 4, 2002 E-mail**

     Swackhammer and plaintiff exchanged a series of e-mails on April 4, 2002.  Plaintiff started the

exchange with an e-mail bearing the subject line "Devil's Brew."  Plaintiff copied Alex Mannela, an outside

consultant employed by a different third-party vendor (Diamond Cluster), on the e-mail.  In the e-mail,

plaintiff wrote: "I just received a bottle of Grand Marnier 150.  If my door is closed today, be scared!!!"

Swackhammer hit the "reply to all" button and immediately responded: "Who would do that to us?????"  In response, plaintiff explained: "Enkata, project kick-off!!!"  Swackhammer took that to mean that plaintiff had received the bottle of Grand Marnier from someone at Enkata, a third-party vendor, as part of the project kick-off.  The Enkata project kick-off was to evaluate whether or not defendant wanted to use Enkata's technology.  Swackhammer was not certain whether defendant had actually enlisted Enkata as a vendor at that point.

In response to plaintiff's e-mails about the Grand Marnier and the Enkata project kick-off, Swackhammer hit the "reply to all" button and e-mailed back, "What did you score for me???"  Plaintiff replied: "Michael wants to get us to SF and possibly a game at Pebble (he's never been and wants to go desperately.)  Don't worry, the pimp is working."  The "Michael" referred to in the e-mail was Michael Chen, the president of Enkata.

Swackhammer and plaintiff contend that the series of e-mails was a joke between the two of them.  However, the portion of the e-mails about Michael wanting them to come out to San Francisco was not a joke.  With regard to the reference to the game at Pebble, plaintiff contends that there is no way to play golf at Pebble Beach unless you make a reservation a year in advance.  When plaintiff wrote: "Don't worry, the pimp is working," plaintiff meant that he was working on getting the trip to San Francisco scheduled.

Plaintiff admits that people in his department called him "pimp" once or twice because of how tough he was on vendors and because he used vendors all the time.

Swackhammer had heard at least one of her direct reports jokingly refer to plaintiff as "the pimp."  Swackhammer never discussed with plaintiff the fact that some people called him "the pimp," but said she knew he was aware of it because she overheard some people say it directly to him.

Castanon testified that he did not believe that the e-mail exchange was a laughing matter.  By sending the e-mail "What did you score for me?," Castanon believes that Swackhammer was not only soliciting a gift for herself, but was also approving plaintiff's behavior.  Castanon also testified that he took plaintiff's "pimp" reference to mean that plaintiff was going to get a vendor to pay for a golf game at Pebble Beach.  In Castanon's opinion, that would be a violation of defendant's gift, travel and entertainment policies contained in the code of business conduct.  Plaintiff contends that there is no evidence that Swackhammer or plaintiff got a vendor to pay for a golf game at Pebble Beach.

Plaintiff testified that he communicated in a joking manner, even though his coach recommended that he be more professional and business-like in his communications.  Plaintiff contends that he did not know the value of the bottle of Grand Marnier he received from Chen, and did not know it was worth more than $100.  During the investigation, plaintiff offered to give the bottle of Grand Marnier to corporate security, which corporate security refused.

### 2.    May 29, 2002 E-mail

On May 29, 2002, plaintiff sent an e-mail to Greg Spero.  Spero was a childhood friend of plaintiff's who did not work at defendant.  The e-mail message reads:

> Yeah, another tough week.  Golf Friday and then off to Australia for a week of work.  FYI, I did get invited to play golf in Aspen with Bill Clinton.  Its [sic] a weekend of business cocktail parties, golf, and a speech by Bill.  I may be able to bring a 'date.'  Everything would be covered except air.  Interested?  We'd have to fly out Thursday July 18th and return that Sunday.  America West and United fly to Aspen.

The e-mail discussed an invitation that plaintiff received from Info USA, a vendor with whom defendant worked.  The cocktail parties, golf and speech were part of a privacy conference.  Plaintiff contends that he was joking when he asked Spero if he wanted to go on the trip because Spero's wife would not let him go,

and "[i]t just wouldn't be appropriate to take a friend on a business trip."  Plaintiff did not take anyone on the trip with him.

Castanon testified that he believed the e-mail violated defendant's business principles because it clearly stated that the vendor would pay every expense on the trip except for airfare.  However, defendant's policy states that employees should not attend any such event if it does not serve a business purpose for defendant.  The policy also requires approval from the division president, chief financial officer, or senior vice president of human resources.  Plaintiff contends that Swackhammer testified that she and plaintiff had a discussion with Castanon about going on the trip and that Castanon said it sounded like a great opportunity. Castanon did not know whether plaintiff went on the trip.

### 3.    June 25, 2002 E-mail

In a June 25, 2002 e-mail from plaintiff to Swackhammer, plaintiff forwarded Swackhammer an e-mail from Holly Valenta, a director of finance, and asked: "Think she'd be my date in Aspen?"  Sometime in 2002, Swackhammer told plaintiff that it was inappropriate to joke around about Valenta.  Plaintiff testified that his e-mail was a joke and that he was not serious about asking Valenta to go to Aspen as his date. Other than the reference to the trip to Aspen in the e-mail, Castanon testified that there was nothing in the e-mail that violates any of defendant's ethical policies.  Swackhammer testified that the mention of a vendor trip does not violate defendant's business principles.

### 4.    July 23, 2002 E-Mail

On July 23, 2002, Swackhammer forwarded a series of e-mails about Diamond Cluster's rates to plaintiff.  Swackhammer's group had an ongoing relationship with Diamond Cluster.  Swackhammer's group had just completed a contract with Diamond Cluster and had renegotiated rates for the next term of

Diamond Cluster's work.  Plaintiff had worked directly with a representative from Diamond Cluster to

negotiate the rates, with Swackhammer's, Castanon's, and Scott Wagner's (from finance) approval.

The e-mails explain that another department at defendant was considering competing bids from both

Diamond Cluster and another vendor, Booz Allen Hamilton.  In its bid, Diamond Cluster had stated its

standard rate.  However, the other department at defendant believed that Swackhammer's group had

negotiated a 50% discount off of Diamond Cluster's standard rate.  In the e-mail to Swackhammer, she was

asked to confirm Diamond Cluster's current rate for the work it was performing.  Rather than confirm the

Diamond Cluster rate, Swackhammer forwarded the e-mail to plaintiff and asked him to comment on the

Cluster rates.

In response, plaintiff sent the following e-mail: "Dena, I'm actually going to discuss this with Jonathan

first on how to position it so he doesn't get screwed on other work if that's OK.  But I DO WANT to show

we are good negotiators and do pay LESS!!!"  The "Jonathan" referred to by plaintiff was Jonathan

Harrison, the Diamond Cluster consultant who was heading the projects and negotiating on behalf of

Diamond Cluster.  The project was canceled before plaintiff ever spoke to anyone about the issue.

Castanon testified that plaintiff's e-mail led him to believe that plaintiff was meeting with Diamond

Cluster to disclose to Diamond Cluster the rates of a competitor so that the competitor would not undercut

Diamond Cluster's rates.  Castanon testified that plaintiff's e-mail made it appear to him that plaintiff was

going to discuss the bid with Diamond Cluster.  Castanon explained that it was inappropriate for plaintiff to

insinuate that he was going to have a discussion like this with Diamond Cluster.  Castanon testified that

Swackhammer should have addressed the fact that this was a confidential conversation and that defendant

does not share bids with competitors.

-13-

Plaintiff contends that corporate security's investigation never established that plaintiff shared proprietary information with Diamond Cluster or that plaintiff ever discussed with Diamond Cluster the pricing of a competitor's bid.  Castanon admitted that he did not know whether plaintiff discussed the issue with anyone at Diamond Cluster.  Plaintiff contends that there is no evidence that he engaged in misconduct or intended to engage in misconduct on this issue.

### I.        Castanon's Termination Decisions

Castanon made the decision to terminate plaintiff and Swackhammer following corporate security's investigation and the October 7, 2002 meeting.  Kissinger recommended that plaintiff be terminated.  Castanon made the decision about plaintiff's employment because Swackhammer, plaintiff's former immediate supervisor, was being terminated for the same conduct that involved both her and plaintiff.

Castanon testified that he believed corporate security had conducted a thorough review of the facts and presented the facts.        Castanon testified that he fired plaintiff and Swackhammer because they had violated a "series" of defendant's business and ethical policies relating to third-parties and vendors.  Castanon further testified that it was clear from the documentation presented at the meeting that plaintiff had violated defendant's policy on ethical business practices on a number of occasions and that Swackhammer was, in many cases, copied on those same documents and chose not to take any action or address it.  In some cases, Castanon felt that Swackhammer chose to participate in the behavior or at least gave the appearance that she was participating in it.  Castanon testified that he considered Swackhammer's own violations, as well has her failure to properly supervise plaintiff, to be "equally serious."  Castanon admits

that he has no proof that defendant was harmed by plaintiff or Swackhammer's alleged misconduct, and that he does not know whether or not Swackhammer was ever successful in getting plaintiff to obtain benefits from vendors for her. According to Castanon, it was the "appearance of impropriety" that mattered to him. Castanon does not know whether Swackhammer or plaintiff personally benefitted from any of their behavior but believed it violated defendant's business practices.

Plaintiff contends that there is no evidence in the facts and documents that Castanon reviewed to prove that either Swackhammer or plaintiff engaged in misconduct or violated defendant's policies.

After the October 7, 2002 meeting with corporate security and Forwalder, Kissinger prepared a document containing "talking points" that reflects the conversations that Castanon and he had as they discussed Swackhammer and plaintiff's situation during the meeting. According to Kissinger, the talking points were prepared after the meeting and not only include the decision that was made, but also reflect the concerns that led to the decision.

### J.      Kissinger's Role in the Termination Decisions

Kissinger testified that, from the e-mails between Swackhammer and plaintiff, he believed Swackhammer was aware that plaintiff was receiving alcohol and soliciting golf trips from vendors, and her lack of response to the behavior led Kissinger and others to believe that she was encouraging plaintiff's behavior.

According to Kissinger, Swackhammer created real or potential conflicts of interest by receiving things of value from vendors that her group does business with or were negotiating with, which created the perception within Swackhammer's organization and perhaps even among vendors that vendor-paid gifts are accepted and expected. Kissinger testified that defendant's policy prohibits conduct that creates an actual

or apparent conflict of interest.  In Kissinger's opinion, a conflict of interest exists if an employee is receiving gifts from someone with whom that employee is supposed to have an objective vendor relationship.

Kissinger also thought that the e-mail exchange referencing the bidding by Diamond Cluster on other defendant business created an actual or apparent conflict of interest.  Regardless of whether it was an actual or apparent conflict, Kissinger thought the conduct was inappropriate.  Kissinger testified that Swackhammer had an obligation to represent the interests of defendant and that it was inappropriate for her subordinate to advise a vendor with whom they do business about how to position itself so it does not get "screwed."  Kissinger testified: "That's not our responsibility.  It's not a responsibility of management and it's inappropriate."  In sum, Kissinger explained that they looked at the totality of circumstances reflected in the talking points and concluded that it reflected a pattern, practice and created an environment that they thought was inappropriate, not in line with defendant's principles, and that needed to be addressed.

In response to Castanon and Kissinger's explanation for the termination decision, plaintiff contends that there is no evidence that he actually solicited golf trips from vendors.  Plaintiff also contends that he and Swackhammer denied engaging in any misconduct, and there is no evidence that either Swackhammer or plaintiff engaged in any misconduct or unreasonably solicited or encouraged vendor-paid entertainment.  Plaintiff also contends that there is no evidence within the e-mails and photographs provided to Castanon and Kissinger that Swackhammer and plaintiff in fact engaged in misconduct.  Plaintiff argues that, in conducting its investigation, corporate security never established that he shared proprietary information with Diamond Cluster, and therefore, within the information Kissinger reviewed there was no evidence that Swackhammer or plaintiff created an actual or apparent conflict of interest.  In fact, plaintiff told corporate

-16-

security that he did not ever talk to Harrison about the rates because the project got cancelled before plaintiff made any response.

**K.      Swackhammer's Termination**

On October 14, 2002, Swackhammer met with Castanon and Kissinger in a conference room. Castanon informed Swackhammer that her employment was being terminated as a result of the corporate security investigation.

**L.      Plaintiff's Termination**

Plaintiff's employment was terminated on the same day as Swackhammer's.  Castanon was not plaintiff's direct supervisor, and plaintiff had very little contact with Castanon.  However, plaintiff was part of Castanon's group.  Castanon concluded that he would make the termination decisions for both plaintiff and Swackhammer because their investigations were related.  Although Shah was plaintiff's direct supervisor at the time plaintiff's employment was terminated, Shah was not involved in the termination decision. However, even though Castanon made the decision to terminate plaintiff's employment, Castanon was not part of the meeting to inform plaintiff of the decision.  On October 14, 2002, Shah and Kissinger met with plaintiff, and Shah told plaintiff that he had been terminated.  Defendant contends that, during the meeting, Shah went through specific reasons that led to defendant's decision to terminate plaintiff's employment, using the talking points that Kissinger had drafted on October 8, 2002, after the meeting with corporate security.

Castanon testified that he fired plaintiff for the same "series of events" reflected in the documents that caused him to fire Swackhammer.  According to Castanon, plaintiff's failure to get advance written approval for certain vendor paid travel, as well as the other facts discussed, showed a pattern of lack of judgment that

warranted termination.  Castanon testified:  "[T]his is not a junior guy in the organization.  This is a senior guy in the organization who absolutely should have known better."

Plaintiff has admitted, in hindsight, that his e-mails were a poor choice of words.  However, plaintiff contends that he does not know why he and Swackhammer were terminated, but he thinks they were being singled out for some reason, of which they are unaware.  Plaintiff contends that he was not given a reason for his termination.  Plaintiff contends that he did not violate defendant's policies or code of ethics in any manner.

### M.    Dispersing of Plaintiff's Job Duties After Termination

Defendant contends that, upon plaintiff's termination, Castanon directed Shah to take on all responsibilities of plaintiff's position, in addition to Shah's own responsibilities, and oversee plaintiff's group directly, so Shah could develop a deeper understanding of the database marketing operations and staff skillsets.  Eventually, Castanon's entire group underwent reorganization, at which time the bulk of plaintiff's former responsibilities were transferred to the marketing department.

Plaintiff contends that Shah only temporarily assumed plaintiff's responsibilities because a department reorganization occurred right after his termination.  Plaintiff contends that Mike Nevels, a Caucasian, assumed plaintiff's responsibilities and a portion of his former team within four to six weeks of his termination.

### N.    Castanon's Relationship with Winters

Castanon admits that his professional and personal relationships with Swackhammer, plaintiff and Winters were different.  Castanon and Winters were close personal friends.  They went to college together at the University of Nevada Las Vegas where they were in the same fraternity.  Before joining defendant,

they worked together for a year or two in Las Vegas.  However, Castanon testified that he did not consider

his personal friendship with Winters as a potential problem in evaluating Winters' performance.  Castanon

was Winters' direct supervisor.  According to Castanon, his relationship with Winters was objective, and he

had the same conversations with him about goals he had to meet as he did with others in his organization.

However, Castanon testified that Kizzire told him that people thought that his and Winters' personal

relationship could interfere with their business relationship.

Plaintiff testified that he recalled hearing that Castanon showed favoritism toward Winters and

treated him differently than his other direct reports.  According to plaintiff, Castanon and Winters were old

friends who went on vacations together and traveled together.  During their employment at defendant,

Castanon hosted and paid for a birthday party for Winters.  Castanon did not host birthday parties for any

other direct reports.

### O.       Corporate Security's Investigation of Castanon and Winters

In October 2002, Winters and Castanon were investigated for alleged violations of defendant's

PBC.  Swackhammer believes that Winters did not obtain written approval for travel, accepted vendor gifts,

and used vendor trips as paid vacations for his family.  Specifically, Swackhammer believed that Winters

violated the PBC by attending the Sundance Film Festival and the Winter Olympics with his wife without

obtaining written approval.

Swackhammer testified that defendant was negotiating with Convergys, a vendor, before and after

Castanon and Winters took the Convergys-sponsored trips to the Sundance Film Festival and the Winter

Olympics.  Swackhammer thought that Castanon and Winters did not have a specific business purpose for

their trip to the Sundance Film Festival and that they went as a customer of the vendor, which would have

been inappropriate.  Swackhammer further thought, but did not know for certain, that a vendor paid the expenses for Winters' wife to accompany him on these trips.

Castanon testified that, at the time he decided to fire Swackhammer and plaintiff, he was aware that he was being investigated by corporate security.  According to Castanon, however, the outcome of that investigation was that there was substantial evidence that he asked for and received proper approvals to attend the events that required approval and that the other items that were in question were clarified.  Castanon testified that he even provided documentation, an e-mail from Levine, to corporate security to substantiate the fact that he had the appropriate approval to attend the Sundance Film Festival and the Winter Olympics.  Castanon admitted that his wife accompanied him on the trips to the Sundance Film Festival and the Winter Olympics, however, he personally paid for her plane tickets and expenses.

Castanon testified that the facts did not warrant firing Winters because, unlike Swackhammer and plaintiff, there was no clear violation of defendant's code of ethical conduct.  During his corporate security interview, Winters admitted that several personal items were improperly expensed to defendant, including a hotel receipt for a movie, two gift shop charges and travel to the airport and airport parking from the Sundance Film Festival, a meal expense from the Winter Olympics, and the rental car fee for a personal trip for Winters' wife to see her daughter's volleyball tournament.  Winters admitted that he did not review the expense reports completed by his assistant after the trips.

When asked whether he obtained approval for the Sundance Film Festival and Winter Olympics trips, Winters responded: "when Convergys [the vendor] invited us to the two events, I went to Tony [Castanon].  Tony told me that we needed to make sure Chuck Levine was OK with it before we said yes.  Tony went to Chuck and I think he may have sent him an e-mail.  I assume Chuck said yes, because we did

attend." Winters also admitted that while he was at the Winter Olympics he was not a host for defendant and did not believe that Castanon was either. Winters testified that he and Castanon took the Convergys people to see defendant's new products but that it was nothing official.

Procter testified that, during corporate security's interview with Castanon, Castanon said that he obtained approval for all of Winters' vendor trips from Levine. Corporate security determined that all of Winters' travel that was the subject of corporate security's investigation had been approved by Levine in accordance with defendant's policy. However, Bass and Procter do not recall seeing written approval for the trips when they conducted their investigation.

During the October 7, 2002 meeting, Castanon decided not to terminate Winters. However, Castanon did have some follow-up discussions with Winters about reviewing some processes with his administrative assistant regarding coding of vacation time, as well as following up to ensure that his expense reports were processed correctly, rather than assuming that his administrative assistant would process them correctly.

Kissinger testified that he thinks he reviewed Winters' signed statement before the October 7, 2002 meeting. Kissinger testified that he could not remember whether or not he made a formal recommendation to Castanon regarding Winters. However, Kissinger agreed with the recommendation that Winters be coached and counseled regarding management and recording of time and expenses instead of being fired.

Kissinger testified that he did not believe it was inappropriate for Castanon to participate in the decision-making process with regard to Swackhammer and plaintiff while he was being questioned regarding his and Winters' travel and vendor relationships. Kissinger explained that Castanon was Swackhammer's

supervisor, and he had not been proven to have done anything wrong at that point.  Kissinger testified he does not know whether or not he saw the complaint against Winters before the October 7, 2002 meeting, however, there was nothing in the complaint that would have caused him to question Castanon's decision about Swackhammer and plaintiff.

Castanon's employment was terminated in August 2003 as part of a reduction in force.  Kissinger testified that one of the reasons that Castanon's employment was terminated was because he did not deal with a personal conflict of interest with Winters.  Kissinger was aware of and supported Castanon's termination.

### P.    Evidence of Discrimination

Plaintiff contends that Winters engaged in similar activity to him and Swackhammer but was not terminated.  However, plaintiff did not know the details of the investigation of Winters and does not know why Winters was not terminated.  Plaintiff contends that Winters should have been treated the same way that he was treated.  When asked about why Castanon treated plaintiff differently than Winters, Swackhammer said that it was because Winters and Castanon were best friends.

Plaintiff contends that many of his Caucasian peers were treated differently than he was, except for Swackhammer, who he also believes was treated unfairly.  Plaintiff testified that he was treated differently than some other peers who received gifts or went on trips (including Nevel, who plaintiff claims replaced him) but who were not investigated.  Plaintiff contends that he and Swackhammer were terminated without cause, and that if they had been allowed to talk to the decision-makers, they would not have been terminated.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670-71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *see Adler*, 144 F.3d at 671 n.1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

-23-

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

**III.    Analysis**

Plaintiff claims that his employment was terminated because of his race/national origin, Hispanic, in violation of both Title VII and the KAAD.  The court notes that it may apply Title VII's standards to plaintiff's KAAD and § 1981 claims. *See Best v. State Farm Mut. Auto. Ins. Co.*, 953 F.2d 1477, 1480 n.2 (10th Cir. 1991) (applying Title VII standards to KAAD claim); *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (adopting *McDonnell Douglas* framework used in Title VII cases for claims filed under § 1981).  Because Title VII's standards and burdens also apply to claims brought under the KAAD and § 1981, *see Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 n.3 (10th Cir. 1997), the court will not specifically address plaintiff's KAAD and § 1981 claims, and reaches the same conclusions under all three statutes.

A plaintiff alleging unlawful race discrimination in his employment must show, either directly or indirectly, that the employer's decision was motivated by intentional race discrimination. *Chatfield v. Shilling Constr. Co.*, 2000 WL 1531846, at *2 (10th Cir. October 17, 2000) (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000)).  "Direct evidence is that which does not require an inference to prove discrimination, such as oral or written statements by an employer showing a discriminatory motive." *Id.*  Because plaintiff concedes that he does not have any direct evidence of discrimination, the court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v.*

-24-

*Green*, 411 U.S. 792, 802-05 (1973).  Under *McDonnell Douglas*, to survive summary judgment, plaintiff must raise a genuine issue of material fact on each element of his prima facie case of discrimination.  *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).  The burden next shifts to defendant to articulate legitimate, nondiscriminatory reasons for the challenged employment action.  *Id.*  If defendant makes such a showing, the burden reverts to plaintiff to set forth facts that raise a genuine issue of material fact that defendant's proffered reasons are pretextual and thus unworthy of belief.  *Id.*  If plaintiff can proffer such evidence, the motion for summary judgment should be denied.  *Id.*

A.      **Prima Facie Case**

To establish a prima facie case of wrongful termination because of his race, plaintiff must show that he: (1) belongs to a protected class; (2) was qualified for his position; (3) was discharged despite his qualifications; and (4) that the position was not eliminated after plaintiff's discharge.  *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005); *Rivera v. City and County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004); *Kendrick*, 220 F.3d at 1229.  However, the Tenth Circuit recently held that "the fourth element of a prima facie case is a flexible one that can be satisfied differently in varying scenarios. . . .  Indeed, where an employer contends the actual reason for termination in a discriminatory firing case is not elimination of the employee's position, but, rather, unsatisfactory conduct, the status of the employee's former position after his or her termination is irrelevant."  *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005).  "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'"  *Id.* (quoting *Kendrick*, 220 F.3d at 1227 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981))).

It is undisputed that plaintiff meets the first three elements of the prima facie case.  The issue before the court is whether plaintiff's position was eliminated after his discharge.  Plaintiff contends that his position was not eliminated because a Caucasian male, Nevels, assumed his job responsibilities within four to six weeks after his termination.

Defendant contends that plaintiff's position was eliminated after his termination and that, when plaintiff's employment was terminated, Shah assumed some of his existing responsibilities and the rest of his responsibilities were assumed by the marketing department.  Defendant also points out that the Tenth Circuit has determined that "the test for position elimination is not whether the responsibilities were still performed, but rather whether the responsibilities still constituted a single, distinct position."  *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996); *see also McMahen v. Gaffey, Inc.*, 52 Fed. Appx. 90, 92 (10th Cir. 2002) (quoting *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992) ("'[s]preading the former duties of a terminated employee among the remaining employees does not constitute replacement.'")).

However, because defendant claims that the reason for plaintiff's termination was his alleged misconduct and not that his position was eliminated, plaintiff need only demonstrate that "h[is] termination occurred 'under circumstances which give rise to an inference of discrimination.'"  *Plotke*, 405 F.3d at 1100 (quoting *Kendrick*, 220 F.3d at 1227).  Because plaintiff has asserted evidence that he was treated differently than Winters, a similarly situated Caucasian colleague, the court finds that plaintiff has met the light burden of proving his prima facie case.  *See id.* at 1099 ("The 'burden of establishing a prima facie case . . . by a preponderance of the evidence' is 'not onerous.'" (quoting *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001))).  Accordingly, the burden shifts to defendant to proffer a legitimate, nondiscriminatory reason for plaintiff's termination.

-26-

**B.     Legitimate, Nondiscriminatory Reason**

Through Castanon, defendant has proffered a couple of reasons for terminating plaintiff's employment.  Castanon testified that he terminated plaintiff's employment because he believed plaintiff violated defendant's business and ethical policies regarding third parties and vendors.  Castanon testified that it was clear from the documentation presented at the October 7, 2002 meeting with corporate security that plaintiff had violated defendant's policy on ethical business practices on a number of occasions.  Castanon further testified that he fired plaintiff for the same "series of events" reflected in the documents that caused him to fire Swackhammer.  According to Castanon, plaintiff's failure to get advance written approval for certain vendor paid travel, as well as the other facts discussed, showed a pattern of lack of judgment by a senior member of the organization who should have known better and that warranted termination.  Although Castanon admits that he has no proof that defendant was harmed by plaintiff's alleged misconduct, he testified that it was the "appearance of impropriety" that mattered to him.

Defendant has satisfied its "exceedingly light" burden to provide nondiscriminatory reasons to terminate plaintiff's employment.  *See Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999).  Accordingly, the court turns to the issue of pretext.

**C.     Pretext**

Plaintiff contends that defendant's proffered reasons for his termination are pretext for discrimination.  To establish pretext, a plaintiff must show either that "a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Watts v. City of Norman*, 270 F.3d 1288, 1293 (10th Cir. 2001).  Plaintiff may accomplish this by demonstrating "such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)).  Plaintiff may also establish pretext by showing that the employer "treated the plaintiff 'differently from other similarly-situated employees who violated work rules of comparable seriousness.'" *Watts*, 270 F.3d at 1293 (quoting *Kendrick*, 220 F.3d at 1230).  However, plaintiff's "mere conjecture that [his] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988).

Plaintiff's evidence of pretext essentially revolves around two main arguments: (1) Castanon's reasons for the termination were false because plaintiff did not engage in misconduct or violate any of defendant's policies, and (2) plaintiff was treated differently than Winters and other Caucasian employees.

### 1.     False Reason for Termination

Plaintiff (1) claims that Castanon should not have made the decision to terminate plaintiff's employment because Castanon was being investigated at the same time; and (2) disputes that Castanon could have had a good faith belief that plaintiff engaged in misconduct that warranted his termination, especially after he and Swackhammer both explicitly denied any wrongdoing.

Regarding plaintiff's argument that Castanon should not have made the decision to terminate plaintiff's employment because Castanon was the subject of a similar investigation at that time, the court will not substitute its business judgment for that of the employer. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999); *Branson*, 853 F.2d at 772.

"The relevant inquiry is not whether defendant's reasons for its . . . decisions were 'wise, fair or correct,' but whether defendant . . . 'honestly believed those reasons and acted in good faith upon those beliefs.'" *Kaster v. Safeco Ins. Co. of Am.*, 212 F. Supp. 2d 1264, 1274 (D. Kan. 2002) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999)).

With regard to plaintiff's arguments that Castanon did not have a good faith belief that plaintiff engaged in misconduct warranting termination, defendant contends that plaintiff has not shown that Castanon's stated reasons for terminating his employment were unworthy of belief. Defendant contends that Castanon relied in good faith on the results of corporate security's investigation to make the termination decision, and that Castanon's belief at the time he made the decision is the relevant inquiry – not whether the allegations against plaintiff were later proven to be false.

The court examines the facts as they appeared to the person making the termination decision. *Watts*, 270 F.3d at 1294. It is undisputed that Castanon made the termination decision based solely on the information he received during the meeting with corporate security (which included plaintiff's and Swackhammer's statements to corporate security) and his review of defendant's policies. Castanon had the opportunity to review plaintiff's and Swackhammer's written statements to corporate security, in which they both denied violating defendant's policies. Castanon has testified that, even though he had no evidence that defendant was harmed by plaintiff's conduct, it was the appearance of impropriety that mattered to him. As the court has previously noted, it will not substitute its business judgment for that of the employer. *Simms*, 165 F.3d at 1330; *Branson*, 853 F.2d at 772. Moreover, the court recognizes that it must evaluate employers' decisions based upon the information available to them at the time the decision was made. *Watts*, 270 F.3d at 1295. Plaintiff has presented no evidence that, at the time Castanon made the decision

-29-

to terminate his employment, Castanon did not have a good faith belief (1) that, despite plaintiff's flat denial, he had violated defendant's business and ethics policies regarding vendors or (2) that, at the very least, plaintiff's actions created the appearance of impropriety.

At the most, plaintiff has established that Castanon exercised poor judgment in completely accepting the results of corporate security's investigation without conducting an independent investigation or speaking directly to plaintiff about the issues before making his termination decision.  Poor judgment by a decision-maker does not establish intent to discriminate, even when plaintiff later submits evidence that the allegations that led to his termination of employment may have been false.  *Vega v. Sprint Corp. (PCS)*, 2004 WL 2414100, at *13 (D. Kan. Oct. 25, 2004) (citing *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998)).  Accordingly, the court finds that Castanon's stated reason for the employment decision was not pretext for discrimination.

### 2.        Treatment of Similarly Situated Employees

Plaintiff claims that defendant treated plaintiff differently than Winters, who plaintiff claims is a similarly situated Caucasian employee who violated work rules of comparable seriousness.[3]  Plaintiff claims that a genuine issue of material fact exists regarding whether Castanon treated plaintiff and Winters differently because of his friendship with Winters or because of their different races.

Defendant contends that plaintiff was treated the same as Swackhammer, a Caucasian, who engaged in similar conduct and was terminated for the same reasons as plaintiff, and that Winters is not similarly situated because his alleged misconduct was not as egregious as plaintiff's and Swackhammer's.

---

[3] Despite plaintiff's general argument that he was treated differently than most all of his Caucasian peers, the specific facts he uses to bolster his argument focus on defendant's treatment of Winters.

Defendant also contends that plaintiff has acknowledged that Castanon had an ulterior and nondiscriminatory motive for treating Winters differently than plaintiff and all of the other employees under Castanon's supervision – his friendship with Winters.

"An employee is similarly situated if the employee deals with the same supervisor and is subject to the 'same standards governing performance evaluation and discipline.'" *Vega*, 2004 WL 2414100, at *13 (quoting *Aramburu*, 112 F.3d at 1404). As the court has previously noted, similarly situated employees are ones who have violated work rules of comparable seriousness. *Watts*, 270 F.3d at 1293. Arguably, both Winters and Swackhammer were similarly situated to plaintiff. Swackhammer was a vice president who reported to Castanon, and plaintiff reported to Swackhammer. Plaintiff and Swackhammer were investigated for alleged violations of defendant's policies regarding vendor relationships and were alleged to have engaged in nearly the same misconduct. Both plaintiff and Swackhammer's employment were terminated, on the same day, by Castanon, even though Castanon did not directly communicate the termination decision to plaintiff. Castanon, who was not plaintiff's direct supervisor, but was his second level supervisor, analyzed the series of events that led to plaintiff's termination of employment and made the termination decision. Winters was a vice president, reported directly to Castanon, and was alleged to have violated defendant's policies regarding relationships with vendors. Winters was counseled regarding his coding of certain expenses with regard to vendor-sponsored travel and directed to work with his assistant to ensure that expenses and vacation time were properly recorded. Plaintiff, Swackhammer and Winters were all subject to the same policies and ethics in dealing with vendors. Viewing the entire record in a light most favorable to plaintiff, and even considering defendant's arguments that Winters' alleged misconduct was not nearly as egregious as plaintiff's, the court will consider Winters and plaintiff to be similarly situated.

However, the court's analysis does not stop there.  Plaintiff contends that he has established pretext by showing that he was treated differently than Winters.  However, differences in treatment that can be explained by a nondiscriminatory motive will not sustain a pretext claim.  *Kendrick*, 220 F.3d at 1320.  The record reflects that, at the time Castanon decided to terminate plaintiff's employment, Castanon was also being investigated for alleged violations of defendant's policies governing relationships with vendors.  In fact, Castanon's travel and expenses on two trips that he took with Winters were investigated at the same time as Winters was being investigated.  In defending against defendant's motion for summary judgment in her gender discrimination case, Swackhammer testified that Castanon had an "ulterior motive" to discipline her more harshly so that he could cover for himself and Winters, both of whom had been investigated.  Swackhammer also testified that she thought Castanon looked at her and plaintiff's cases as an opportunity to take action to save not only his own job, but also Winters' job.  *See Swackhammer v. Sprint/United Mgmt. Co.*, 2005 WL 1319058, at *15 (D. Kan. May 13, 2005).

The record also reflects that Winters and Castanon had been close personal friends for years.  They went to college together, were fraternity brothers, and worked together before their employment with defendant.  Castanon and Winters traveled together and went on vacations together.  Plaintiff testified that he recalled hearing that Castanon showed favoritism toward Winters.  Swackhammer testified that Castanon treated plaintiff differently than Winters because Winters and Castanon were best friends.  Although Castanon testified that he did not consider his personal friendship with Winters as a potential problem in evaluating Winters' performance, the record reflects that Castanon treated Winters differently than

Swackhammer or any other direct report, both male and female, and no matter the race.[4]  For instance,

Castanon hosted and paid for a birthday party for Winters even though he did not do so for any other direct

report.

      Viewing the entire record, the only support that plaintiff has for his race/national origin discrimination

claim is that Winters is a Caucasian and he was not terminated – albeit by his Hispanic supervisor.  Similarly,

Swackhammer, in pursuing her gender discrimination claim against defendant, testified that the only evidence

of discrimination she had was that Castanon and Winters were best friends, and Winters was a man who

was treated differently.  However, Swackhammer, a Caucasian female, was terminated on the same day for

the same reasons as plaintiff.  As this court determined in Swackhammer's case, even viewing the evidence

as a whole in a light most favorable to plaintiff, it is insufficient to establish pretext where Castanon's different

treatment of Winters clearly stems from their close friendship.  *See Swackhammer*, 2005 WL 1319058, at

*22.  Winters benefitted from Castanon's favoritism toward him.  While such differential treatment may have

been unfair to plaintiff and Swackhammer (and Castanon's other direct reports), it does not raise an

inference of discrimination based on either race or gender.  "[A]n employer's actions based on loyalty to a

friend or relative . . . are not considered 'discriminatory,' even where they benefit the nonprotected friend or

relative at the expense of a more qualified, protected person."  *Neal v. Roche*, 349 F.3d 1246, 1251 (10th

Cir. 2003).  Moreover, "employers are free to employ nondiscriminatory criteria that are 'unfair' or even

reprehensible, so long as they are not discriminatory."  *Id*. at 1252.

--------

    [4] Plaintiff recalled one staff meeting where Castanon made a joke about "how Spaniards speak" but cannot recall when the meeting occurred or anything else about it.  Castanon's isolated comment, that had no connection to plaintiff's termination, is also insufficient to demonstrate discriminatory animus.  *Voltz v. Coca-Cola Enter. Inc.*, 91 Fed. Appx. 63, 72 (10th Cir. 2004) (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994)).

For the foregoing reasons, plaintiff has presented no evidence to create a genuine issue of material fact that defendant's proffered reasons for terminating him are pretext for discrimination.  Summary judgment is thus appropriate on plaintiff's claims of race/national origin discrimination based upon his termination of employment.

**IT IS THEREFORE ORDERED** that defendant's Motion for Summary Judgment (Doc. 57) is granted.

Dated this 9th day of December 2005, at Kansas City, Kansas.


s/ Carlos Murguia
CARLOS MURGUIA
United States District Judge